578 A.2d 453

**Margaret T. TARTER and William J. Tarter, Husband and Wife, Appellants,**

**v.**

**Jay G. LINN, Jr., M.D.**

Superior Court of Pennsylvania.

Argued May 8, 1990.

Filed July 18, 1990.

Reargument Denied Aug. 8, 1990.

156

William J. Tarter, Pittsburgh, for appellants.

David H. Trushel, Pittsburgh, for appellee.

Before CAVANAUGH, ROWLEY, McEWEN, OLSZEWSKI, DEL SOLE *, MONTEMURO, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.

JOHNSON, Judge:

Margaret Tarter and William J. Tarter, her husband, brought this medical malpractice action against Dr. Jay G. Linn, an ophthalmologist. Approximately three months after Dr. Linn prescribed the drug Diamox to treat Margaret Tarter's glaucoma, she was diagnosed as having aplastic anemia, an irreversible disorder that inhibits the bone marrow's production of blood components. The Tarters' complaint alleged that Dr. Linn was negligent because he failed to warn Margaret Tarter that a rare incidence of aplastic anemia resulted from Diamox treatment. A jury found for Dr. Linn. On appeal the Tarters asked this Court to expand

* Judge Del Sole recused himself from this case.

the informed consent doctrine, which applies only to surgical procedures, to cover treatment by therapeutic drugs. We certified this case for en banc consideration of this precise issue.

Unfortunately, whether the law of informed consent should apply to this case was never an issue at the trial level. Therefore, the Tarters do not and could not allege that the trial court committed any error in a ruling involving informed consent. The Tarters did not raise an informed consent issue in post-trial motions. The issue of whether the law should be changed to allow the law of informed consent to apply to this case is raised for the first time in this appeal. Under these circumstances, fundamental principles of decisional law instruct that this issue is not before us and cannot be decided by this Court. *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 214–215, 489 A.2d 1291, 1296 (1985).

Our Supreme Court established the doctrine of informed consent in the case of *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966). *Gray* teaches that physician and patient have a contractual agreement on the scope and nature of the patient's care. The doctor has no right to come into contact with the patient's body except within the terms of the agreement. A surgeon who treats an individual in a manner not agreed upon—not consented to—commits a technical battery and is responsible for the consequences of the tort. The patient does not consciously consent unless he is aware of the risks and possible benefits of the treatment. Based upon these principles, the *Gray* court held that consent is valid only if the individual grants it after being adequately informed of the dangers to be anticipated. *Gray*, 423 Pa. at 166, 223 A.2d at 670.

In order to establish liability under informed consent, a plaintiff must show that:

(1) the physician fails to disclose any risk in the recommended treatment, or the existence of any alternative method of treatment, that a reasonable person would deem material in deciding whether to undergo the recom-

mended treatment; (2) the patient would have forgone the recommended treatment had he or she known of the undisclosed information; and (3) as a result of the recommended treatment, the patient actually suffers an injury the risk of which was undisclosed....

*Neal by Neal v. Lu,* 365 Pa.Super. 464, 478, 530 A.2d 103, 111 (1987). Although the battery rationale expressed in *Gray* has recently been challenged, *see Levenson v. Souser,* 384 Pa.Super. 132, 557 A.2d 1081 (1989), it is still the law in this Commonwealth. Our courts have expressly held, relying upon the *Gray* rationale, that informed consent does not apply to cases involving therapy by administration of drugs. *Boyer v. Smith,* 345 Pa.Super. 66, 497 A.2d 646 (1985), *appeal denied* 1986; *Malloy v. Shanahan,* 280 Pa.Super. 440, 421 A.2d 803 (1980).

By contrast, a plaintiff who brings a medical malpractice case in negligence must prove that the act or omission of the physician fell below the standard of care owed the patient. *Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196 (1980). This standard must be established by expert testimony. *Lira v. Albert Einstein Medical Center,* 384 Pa.Super. 503, 559 A.2d 550 (1989). The specialist is held to a higher standard of skill, which is determined by other practitioners in his specialty, *Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674 (1982), and is based upon the practice at the time of the alleged malpractice. *See Incollingo v. Ewing,* 444 Pa. 263, 444 Pa. 299, 282 A.2d 206 (1971).

Under the negligence standard upon which the Tarters proceeded at trial, they were required to prove that Dr. Linn's conduct in refraining from telling Margaret Tarter of the risk of aplastic anemia when he prescribed the Diamox fell below the standard of care as established by expert testimony at trial. If the Tarters had proceeded under informed consent, they would have had to prove that a reasonable person in Margaret Tarter's place would want to know of the risk and that Margaret Tarter would have refused the Diamox treatment had she known of the risk.

160

The Tarters instituted this lawsuit against Dr. Linn on August 25, 1985. The complaint alleged as follows:

8. The injuries to Wife–Plaintiff and the damages to Plaintiffs, as more fully set forth below, were directly and proximately caused by the *carelessness and negligence* of the Defendant, generally, and in the following particulars:

(a) in that Defendant *negligently misdiagnosed* and rendered a delayed diagnosis of Wife–Plaintiff's chronic angle closure glaucoma and, due to the failure to recognize the conversion of her primary open angle glaucoma into a chronic narrow angle glaucoma Wife–Plaintiff's condition deteriorated to the point where laser iridotomy became ineffective in reopening the angle and laser trabeculectomy was rendered impossible. As a result of said negligent misdiagnosis and delayed diagnosis, a condition evolved which prompted Defendant to prescribe the drug Diamox;

(b) in that the Defendant *negligently failed to advise* Wife–Plaintiff of surgical trabeculectomy as an alternative to Diamox;

(c) in that the Defendant *negligently failed to warn* Wife–Plaintiff of any adverse reactions associated with the ingestion of Diamox including, but not limited to aplastic anemia;

(d) in that the Defendant failed to monitor Wife–Plaintiff's condition for detection of reactions associated with the sulfonamide derivative, which monitoring could or would have prevented the development of aplastic anemia;

(e) in that the Defendant *negligently failed to obtain* baseline CBC and platelet counts prior to initiating Diamox therapy and in negligently failing to do so at regular interval during the time Wife–Plaintiff was prescribed therapy;

(f) in that the Defendant *negligently failed to perform* or recommend to Wife–Plaintiff the alternative of iridotomy prior to prescribing Diamox therapy;

(g) in that the Defendant knew that Wife–Plaintiff was suffering from certain side effects associated with ingestion of Diamox and *negligently failed to discontinue said drug or negligently failed to procure* additional work-up on Wife–Plaintiff to determine the advisability of continuing said therapy in view of said adverse reactions;

(h) in that the Defendant was *negligent* in allowing Wife–Plaintiff's ocular condition to deteriorate to the point where Diamox therapy became an alternative, and;

(i) in that the Defendant *negligently failed to timely refer* Wife–Plaintiff to a consultant or other physicians who may have been capable of adequately monitoring Wife–Plaintiff's care and treatment both before prescribing Diamox and thereafter *to monitor her reaction* to the Diamox therapy initiated by Defendant.

Emphasis supplied. Despite the "failed to warn" language in part (c) above, it would be difficult, although possible, to argue that the complaint successfully pleads an informed consent cause of action.

However, counsel for the Tarters did not develop this possibility of making informed consent an issue; to the contrary, he expressly precluded it at trial. The following overview of the evidence presented and of the instances in which informed consent was discussed by counsel and the court will demonstrate this point. Dr. Linn testified that he prescribed Diamox for Margaret Tarter's glaucoma on September 20, 1983 and that at that time he explained the following side effects of the drug: tingling in the fingers and toes, frequency of urination, mild diarrhea and loss of potassium. These conditions are not symptomatic of underlying disorder. N.T., June 7–8, 1988 at 343–345. Dr. Linn instructed Tarter to return to his office frequently for monitoring the treatment's progress and the Diamox side effects. Dr. Linn testified that he knew of the rare incidence of aplastic anemia associated with Diamox. The expert testimony varied on the statistical incidence, placing

it between two or three per five-hundred thousand to one in a million.

Dr. Linn testified that he decided not to tell Tarter of this possible complication because the information may have caused her to decide not to take Diamox. N.T., June 7–8, 1988 at 345–346. While there was some conflicting testimony on the standard of care, Dr. Linn's experts testified that the standard of care at the time of treatment was not to inform the patient of this risk. Throughout trial, the court properly sustained objections to the attempts of Tarter's counsel to establish the standard of care by introducing information on Diamox appearing in the Physician's Desk Reference. *See* N.T., June 1, 2 and 6, 1988 at 216. The Physician's Desk Reference, prepared with information provided by drug manufacturers, contains discussions of possible adverse reactions to the drugs catalogued.

Tarter testified that on her November 14, 1983 visit to Dr. Linn she told him that she had bruises without apparent cause. N.T., June 1, 2 and 6 at 106. Bruising is not a side-effect of Diamox as are the above-mentioned signs but rather is a symptom of aplastic anemia. However, Dr. Linn testified that Tarter never reported bruising to him. His office records for Tarter's visit that day recorded that Tarter mentioned having the tingling sensations. They made no mention of bruising. Further, in interrogatories she answered in 1985, Tarter stated that she had told Dr. Linn about tingling; her interrogatory answer did not state that she told Dr. Linn about bruising. N.T., June 1, 2 and 6 at 108.

Early in the proceedings, during direct examination of Margaret Tarter, Tarter's counsel asked, "What, if anything, did you learn about Diamox ... on the day that Dr. Linn prescribed it?" N.T., June 1, 2, 6, 1988 at 44. Defense counsel objected because "informed consent is not part of the drug case, and that's where we're heading." *Id.* This exchange followed:

THE COURT: ... [Addressing Tarter's counsel, Mr. Gordon]: you have indicated in chambers that you are proceeding on—

MR. GORDON: Not informed consent.

THE COURT: Then why is this question proper?

MR. GORDON: Well, I can't try this in a void. I think the issue of what she knew isn't [sic] going to be important because, as he raised in chambers, she reports it anyway. The whole—I think we're allowed to talk about everything surrounding the administration of the doctor's conduct and—

MR. TRUSHEL: You're not allowed to talk about things that are irrelevant, and the law is very clear that the law of informed consent is not applicable to a physician prescribing a drug.

THE COURT: Well, I'm—

MR. GORDON: You keep saying that, and I agree.

THE COURT: Let's go beyond that. You have indicated to the Court that you are not proceeding in this case on informed consent theory.

MR. GORDON: Correct.

. . . .

What our experts are going to testify is that Dr. Linn did not adhere to acceptable standard in medical care and treatment, number one. Prescribed this drug without giving these warnings to the patient and tell her that be on the lookout for these danger signs or signals of these reactions.

N.T., June 1, 2, 6 1988 at 45–46.

Following the close of testimony the court ruled on both parties' proposed points for charge. Counsel and the court conducted the following discussion:

MR. TRUSHEL: Can I ask a question or a couple of questions. Is the Court going to charge on informed consent?

THE COURT: I'm trying to figure out how to answer that question.

MR. TRUSHEL: I can understand your dilemma.

THE COURT: I find in this case that although he's not suing on informed consent, there are a number of things that I would charge in an informed consent case that I'm going to charge that—I'm not going to charge that this is a case that involves informed consent.

MR. TRUSHEL: Well, for whatever it's worth—

THE COURT: You want me to make that any clearer?

MR. TRUSHEL: Well, it's been my position throughout this case, and in order to be consistent, it is still my position and I believe it that informed consent—and I don't want to repeat what I said 15 times. Under the law of this Commonwealth it is not applicable to drug cases, and I don't care whether just because you call a tomato a carrot doesn't make it a carrot, and Mr. Gordon keeps saying it is not informed consent, it is negligence, and I couldn't agree more violently.

. . . .

MR. GORDON: Your Honor, just I agree with what you said, and I agree with when Mr. Trushel said about informed consent not being a part of this case. . . .

N.T., June 7, 8 1988 at 486–488. The court decided to charge the jury by putting the failure to warn factor into the context of a negligence standard. N.T., June 7, 8 at 488–489.

The court charged the jury as follows:

It is also medical malpractice when the physician shows the lack of proper care and skill in the performance of a professional act. You have heard a great deal in this case about what the physician knew about the risks. You have heard a great deal about what was said or what was not said about risks. I want to talk to you a little about that.

A physician is bound to disclose those risks which a reasonable person would consider material in arriving—in

considering the conduct that a physician proposes. Now, this does not mean that the doctor is required to give the patient a complete course in anatomy and to explain every risk no matter how remote before he prescribes something. The determination of what a reasonable *person* would do or consider significant is for the jury to decide.

A physician is not liable if you find that the furnishing of the information in question to the patient would have resulted in some serious adverse effect on the person or in the therapeutic process. It means he tells him so much that a patient would not undertake the medication, he doesn't have to scare the patient to that extent. A physician does not have to disclose every risk no matter how remote in order to perform his skill as a physician. And that is [sic] what should be disclosed is a matter for the jury.

N.T., June 7, 8 1989 at 541–542. We reject Dr. Linn's suggestion to this Court that the jury was actually charged on informed consent because language in the second paragraph quoted above suggests the informed consent standard. The charge when read as a whole instructs on negligence only. Neither party objected to the charge as given, which substantially corresponded to what the court told counsel that it would charge in the review of points for charge, part of which was reproduced above.

 On June 9, 1988, the jury returned a general verdict for Dr. Linn. Subsequently, Tarter filed a motion for post-trial relief alleging numerous errors, none of which included any of the three issues presented to this Court on appeal. In addition to the informed consent issue, Tarter claims on appeal that the trial court demonstrated bias and that the verdict was against the weight of the evidence. None of these issues are properly preserved; they were neither raised at trial nor raised in post-trial motions. Issues not preserved for appellate review cannot be considered by an appellate court. *Reilly by Reilly v. SEPTA, supra.* Nevertheless, a thorough review of the record belies a claim that the verdict shocks the conscience, *Hreha*

*v. Benscoter,* 381 Pa.Super. 556, 554 A.2d 525 (1989), *cross-appeals denied,* 524 Pa. 608, 569 A.2d 1367 and 524 Pa. 621, 571 A.2d 383 (1989), or that the Honorable Maurice Louik conducted this trial in any but an exemplary manner.

There is no dispute that Margaret Tarter has sustained serious damage to her health and lifestyle, and that this damage is a result of the drug Diamox. We may not create a new cause of action, however, when no foundation for our doing so had been developed and preserved at trial. By this opinion, we do not seek to give any indication of how we may view this proposed theory of liability. This court will pronounce upon the viability of such a cause of action only when the question comes squarely before it. Hence, we affirm the judgment entered on May 2, 1989.

Judgment affirmed.